Filed 5/1/25  In re Taylor CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re KIRELL FRANCIS TAYLOR,<br><br><br>on Habeas Corpus. | B340715<br><br>(Los Angeles County<br>Super. Ct. No. LA033959) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas Rubinson, Judge.  Order to show cause is discharged; petition is denied.

Mark Yanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Kirell Taylor of special circumstance felony murder and related crimes in 2001.  In 2024, Taylor, acting in propria persona, filed a petition for writ of habeas corpus based on the Racial Justice Act, Penal Code section 745 (RJA).[1]  Taylor alleged the trial court, jury, prosecutor, and a law enforcement officer exhibited bias against him during trial.  He sought appointment of counsel and discovery of the reporter's transcript from jury voir dire that occurred on September 7, 2001.

After the trial court denied his petition on the merits, without appointing counsel, Taylor filed a substantively identical petition in this court.  A different panel summarily denied it.  Taylor then filed the petition in the Supreme Court, which issued an order directing the Secretary of the Department of Corrections and Rehabilitation to show cause before this court why Taylor "has not satisfied the requirements for the appointment of counsel pursuant to Penal Code section 1473, subdivision (e) and for the production of discovery pursuant to Penal Code section 745, subdivision (d)."

We appointed counsel for Taylor and received and considered a return from the Secretary and a traverse and request for judicial notice from Taylor.  We deny the request for judicial notice and conclude that Taylor has not satisfied the requirements for the appointment of counsel or the production of discovery because he has not satisfied the statutory requirements under the RJA.  The bias Taylor alleges is predicated upon his religion, which is not a protected category under the RJA.  We accordingly discharge the order to show cause and deny the petition.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

# BACKGROUND

We draw the following background from the writ petition Taylor filed in the Supreme Court, No. S284425, and the appellate record from Taylor's direct appeal, on which both he and the Secretary rely in their filings. At this stage, we "accept the truth of the defendant's allegations, including expert evidence and statistics, unless the allegations are conclusory, unsupported by the evidence presented in support of the claim, or demonstrably contradicted by the court's own records." (*Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 23 (*Finley*).) All quotations are rendered as they appear in the record.

## I. Relevant Pretrial Proceedings

Taylor represented himself both prior to and during his trial. During pretrial proceedings before Judge Rosenblatt, Taylor, who is Black and Muslim, filed a motion for change of venue. Taylor asserted several grounds for the request, including his membership in "an organization called the 'Moorish Islamic Impire of the West,' which could cause arouse community hostility from the predominantly Christian and Jewish sects evolving the San Fernando Valley district" and the "innumerable stereotyping of Muslims" by "countless Sheriff Deputy Bailiffs whom some have beset & expressed racial and religious slurs in my presence." He also asserted that "based on the victim being white and the defendant being black there exist a grave possibility I will not receive a fair just trial in the San Fernando Valley Judicial District." Contrary to his suggestion that the trial court ignored this motion, Taylor voluntarily withdrew the motion before the trial court heard or ruled on it.

Taylor also filed a motion to wear a kufi, a short round cap Taylor describes as a "Muslim religious hatt," in jail and in court.

3

The bailiff informed the court that jail inmates were not permitted to wear any "personal clothing whatsoever." When the court asked Taylor for his response, he asserted that the court was prejudiced and should be sued for racketeering. He added, "I'm biased already. I'm Black. I'm Muslim. I'm considered everything under the sun." The court asked Taylor to address the motion, and he said, "Deny it. You've been denying everything else." The court ruled that the motion was "denied except that the court will permit Mr. Taylor to wear his kufi in court, if it has been provided in advance to the Sheriff's Department, so that it can be searched, and it is held here as any other civilian clothing would be held here in court."

Taylor made several allusions to terrorism during pretrial proceedings. On two separate occasions, he asserted that the court was treating him like "the Black Timothy McVeigh." He also alleges that he wrote Judge Rosenblatt several ex parte letters, one of which stated, "Don't be surprised when I drag 'OSAMA BIN LADEN' in your courtroom. But don't hold me for kidnapping because I want five million dollars." The record from Taylor's direct appeal reflects that Taylor sent multiple ex parte letters to Judge Rosenblatt, but it does not contain the letters or much information regarding their contents. Taylor alleges he had "plans to capture Osama Bin Laden" and "prevent the 9/11 terrorist attack," to which he alluded in at least one of the letters. Taylor also alleges he was in phone communication with "9/11 hijacker" Mohammed Atta, and received from Atta the "top secret plans" for the attack.[2]

---

[2] Taylor attached to his petition an air mail envelope that allegedly contained the plans. In the trial court, Taylor alleged

4

## II.   Alleged Judicial and Jury Bias
### A.    Voir Dire

The matter was transferred from Judge Rosenblatt to Judge Hoff for final pretrial motions and trial.  On September 6, 2001, Taylor provided the court with a list of questions he wanted the court to ask during voir dire.  After apparently reviewing the list, which is not in the record, the court advised Taylor that some of his questions "really aren't appropriate to ask."  Specifically, the court explained, "I don't believe it's appropriate to ask jurors about their religious beliefs," or whether "they believe in the existence of God," because those topics were "personal" and "private."  However, the court told Taylor, "it's all right to ask if they have a bias against a particular religion."  The court also added that its own questions would cover Taylor's "question about can you be fair."

On September 6, 2001, before the potential jurors were brought in, Taylor changed into "street clothes" his family brought to court for him.  Taylor alleges in his petition that the clothing consisted of "traditional Islamic attire," including his kufi, and that he wore similar clothing on September 7, 2001.  Respondent asserts that the record at no point "clearly reflect[s] what he was wearing," but we treat Taylor's assertions as true at this stage.  Moreover, witnesses who testified later in the trial described Taylor as "wearing the white cap and a white tunic" and a "white outfit, white hat."

---

that the exact same envelope contained evidence linking case victim Christopher Rawlings to a "network of mass mind manipulation research establishments" that "direct the policies of the global elite network."

The first phases of jury voir dire occurred on Thursday, September 6, 2001. The proceedings were reported but not transcribed.

Voir dire continued and concluded on Friday, September 7, 2001. It was also reported but not transcribed. In his writ petition, Taylor alleges that he was "dressed in Islamic clothing" and was "incredibly angered" this day, purportedly due to his unsuccessful attempts to convince Mohammed Atta to postpone the 9/11 attacks and alert the FBI of the plans. Taylor further alleges that he "asked a juror how it will feel 'to see in the news and media' during petitioner's trial a 'terrorist attack' committed by fake 'so-called Muslims.'" Taylor makes no allegations about the prospective juror's response, any follow-up questions or colloquy, or whether that person was seated on the jury. However, the record reflects that on September 13, 2001, Taylor told the court, outside the presence of the jury, that he "told the people of the jury panel last week" that "[i]f any terrorism was to occur or that they read in the paper, I'm not saying that would occur, that they read in the paper, would they be biased to that and et cetera et cetera. They told me no."[3] Taylor also asserted

_____

[3]     Taylor amended the reporter's transcript attached to his petition with the handwritten insertion "[NEVER]," so the sentence reads "They NEVER told me no." The certified reporter's transcript is an official record and "is prima facie evidence of that testimony and proceedings." (Cal. Civ. Proc., § 273, subd. (a); *People v. Reed* (1996) 13 Cal.4th 217, 225.) Taylor has not taken any appropriate steps to correct this alleged omission, or any other alleged errors or omissions in the reporter's transcript. (See *Eagle Fire & Water Restoration, Inc. v. City of Dinuba* (2024) 102 Cal.App.5th 448, 463-464; *cf. People v.*

6

during closing argument that during voir dire, "I questioned you guys as to terrorism, Islamic groups, what happened the next week?  Shit happens.  And I know that's probably like, whoa, I'm sitting at home I know you are like, ladies and gentlemen, I know you are like, wow, he just asked us this –"

The trial court was dark on Monday, September 10, 2001. Taylor's trial was set to resume on Tuesday, September 11, 2001, but was continued to September 12, 2001 after the trial court was closed "due to the uncertainties surrounding the terrorist attacks against the United States this date."

On the morning of September 12, 2001, before the jury was brought in, Taylor told the court, "I'm going to open the jury up and talk about – and question them – voir dire them again about the incident that happened yesterday based on me being Muslim."  The court responded, "I'm going to take care of that." Taylor replied, "If they got a problem with it and they are prejudice, I'm kicking them off the panel."  The court again assured Taylor, "I'm going to take care of that. Okay.  That's my job."

When the jury was brought into the courtroom, the court stated, "Ladies and gentlemen, as we all know, something horrible happened yesterday, and the real question I have for you is anybody going to let that interfere with giving both sides a fair trial in this case?"  The reporter's transcript states, "Jurors

*Carter* (2003) 30 Cal.4th 1166, 1199 ["where the clerk's and reporter's transcripts conflict, the latter controls when, under the circumstances, it is the more reliable"].)  We accordingly disregard this and other alterations Taylor has made to the reporter's transcript.

answer in the negative." Taylor alleges this is false and that in fact "NO JURORS RESPONDED."[4] He asserts that "(1) all jurors set stone faced, (2) did not utter one word whatsoever, and (3) throughout the trial jurors looked at petitioner as a racist 'black muslim' terrorist on the basis of petitioner's 'race' and 'physical appearance' including his words on Sep 7th, 2001" about "an impending attack to be committed 'by so-called muslims.'" Taylor alleges it was "racially discriminatory" "for the jurors to have perceive petitioner was from the NATION OF ISLAM or AL QAEDA," and the trial court evinced bias toward him by preventing him from conducting further voir dire "to ascertain the jurors bias about the attacks."

### B.    Motion for Mistrial

On September 13, 2001, after several prosecution witnesses had testified, Taylor moved for mistrial "based on the overlapping circumstances in this case, the way I'm dressed." Taylor asserted he was "pretty much biased by now, pretty much prejudiced in the jury's eyes by now, I mean my attire has exemplified that. No juror would like to look at me in my eyes during my cross-examination,[5] so, you know, two days after the incident, as tragic as it was, I don't think that I'm going to get a fair trial." The court responded, "Well, if you remember, I asked all the jurors before we started and they said they could still be fair

---

[4]    Taylor attached the relevant page of the reporter's transcript to his petition, with the handwritten annotation, "JURORS DIDN'T SAY ONE WORD."

[5]    Because he represented himself, Taylor cross-examined the prosecution witnesses. He had not yet testified or been cross-examined by the prosecutor as a witness.

8

notwithstanding the horrible things that happened Tuesday."[6] The court continued, "Nobody knows, at least I don't know, who caused the atrocities that happened in New York and Washington."[7] Taylor replied, "That could have been prevented by your leave." The court responded, "Well, that's what you say," and denied the motion for mistrial.

### C. Post-Trial Juror Comments

Taylor attached to his petition an October 2, 2001 *Los Angeles Times* article with the headline "Killer Goes Berserk After Conviction." The article describes the "pandemonium" that arose in the courtroom after Taylor's conviction, as Taylor "spat at the prosecutor, causing armed bailiffs to drag him away, kicking and cursing, while his screaming mother also had to be forcibly removed."

The article further states: "Jurors, who deliberated about five hours, said Monday they thought Taylor tried to deceive them, and that his verbal attacks on police and the court backfired on him. 'He not only had not much respect for the whole American way of life, he had no respect for the judicial system, which is the best in the world,' said the jury's forewoman, an aerospace project manager who lives in the West Valley. 'His demeanor, his behavior and his lack of respect for everybody

---

[6] In handwritten annotations, Taylor claims this statement was "[False]" and asserts, "To be clear, no jurors responded to the judge's question. Judge Hoff made a false statement."

[7] Taylor echoes the court's sentiment in his petition, asserting, "On 9-13-2001, the news reports had not even ascribe the terrorist attacks to Bin Laden." However, in his traverse, he claims the court's remarks were "implausible given that most Americans knew by the afternoon of 9/11 that Muslim men had committed the attacks."

really made him lose credibility.' [¶] Jurors praised Samuels, the prosecutor, and Purdy, the LAPD detective. They rolled their eyes when asked about Taylor's courtroom performance. [¶] 'His defense was terrible. I think he was lying about everything,' said a 37-year-old Northridge man, a phone company service technician. [¶] Jurors, who learned about Taylor's outburst afterward from court staff, said they were not surprised. [¶] 'That's what happens when you believe your lies,' said a female juror, a 37-year-old textile engineer. 'It was pretty consistent with his behavior in court. He always seemed to be on the edge of hostility.'"

Taylor alleges, "Clearly, members of Al Qaeda 'had not much respect for the whole American way of life.' And, it is clear the forewoman of the jury looked at petitioner as a racist 'black muslim' terrorist and/or an operative of Al Qaeda whom, 'NOT ONLY HAD NOT MUCH RESPECT FOR THE WHOLE AMERICAN WAY OF LIFE, he had no respect for the judicial system, which is the best in the world.'"

## III. Alleged Prosecutor and Law Enforcement Officer Bias

### A. Prosecutor

On September 13, 2001, outside the presence of the jury, the court discussed scheduling issues with the parties. The prosecutor told the court that she was having difficulty scheduling her DNA expert witness, who "was scheduled to be on a flight six hours after the flight that was used to commit the atrocities, that exact flight, Dulles to L.A., a different airline. I'm amazed that he's even willing to fly here at all, but he is, but I just have to accommodate him a little." Taylor said he had no problem accommodating the witness. After further discussion,

10

the prosecutor said, "Who is going to know when you are going to have a terrorist attack, you know."

Taylor alleges that the prosecutor "turned to her left to look at petitioner as a 'black muslim' 'terrorist'" while making that comment. In an attachment to his petition, Taylor similarly asserts that the prosecutor "turned her body to look at petitioner directly when she made that coded prejudicial statement." He "contends it is unreasonable or naïve at best—and disingenuous at worst—to suggest, as [the prosecutor] did, that petitioner did not do anything to try to prevent the 9/11 victims' plight. PC Section 745 targets precisely this sort of racially biased language." Taylor additionally challenges the prosecutor's "indication that petitioner was a 'black Timothy McVeigh' and/or a racist 'black muslim' terrorist," but these allegations are demonstrably contradicted by the record, which indicates that Taylor was the only person to mention Timothy McVeigh and did so unprompted and of his own accord.

## B.     Law Enforcement Officer

On September 20, 2001, Taylor called the prosecution's investigating officer, Andrew Purdy, as a defense witness. During a line of direct examination about the investigation into the charged crimes, Taylor asked Purdy, "And is a murder investigation the utmost investigation as far as crimes?" Purdy responded, "Yes, that, and maybe terrorism." Taylor then repeated, "That and maybe terrorism" before asking his next question.

Taylor alleges that he, Taylor, actually "screamed 'That, and maybe terrorism'" in response to Purdy's testimony. He further alleges that Purdy "clearly suggested petitioner was an international Islamic terrorist that should be investigated for

11

treason. The implicit 'coded language' in Mr. Purdy's answer was tantamount to referring to petitioner as a monkey or" using the N-word. Taylor asks, "In light of petitioner's stereotypical appearance: Was detective Purdy allowed to inject into his answer his stereotypical racial animosities about terrorism?"

## DISCUSSION

The questions before this court are whether Taylor has satisfied the requirements for the appointment of counsel pursuant to section 1473, subdivision (e) and for the production of discovery pursuant to section 745, subdivision (d). We answer both questions in the negative.

### I.     RJA Overview

The Legislature enacted the RJA in 2020 (*McIntosh v. Superior Court of San Diego County* (2025) 110 Cal.App.5th 33, 44 (*McIntosh*); Stats. 2020, ch. 317, § 1) and amended it in 2022 to apply retroactively to certain categories of cases. (*People v. Wilson* (2024) 16 Cal.5th 874, 946 (*Wilson*); § 745, subd. (j).) Its "central purpose . . . is to provide meaningful remedies for proven racial discrimination in the administration of criminal justice, and thus to eliminate racial bias in California's criminal justice system." (*Wilson, supra*, 16 Cal.5th at p. 954; see also Stats. 2020, ch. 17, § 2, subd. (i) [purpose is "to eliminate bias from California's judicial system because racism in any form or amount, at any stage of a criminal trial, is intolerable [and] inimical to a fair criminal justice system"].) The "expansive" legislation is intended to reach not only "purposeful discrimination" but also "*un*intentional and *un*conscious" implicit bias. (*Bonds v. Superior Court* (2024) 99 Cal.App.5th 821, 828-829, original italics; § 745, subd. (c)(2) ["The defendant does not need to prove intentional discrimination."].)

The RJA provides that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin.'" (§ 745, subd. (a).)  A violation of the RJA "is established if the defendant proves, by a preponderance of the evidence," conduct enumerated in section 745, subdivisions (a)(1) through (a)(4). (§ 745, subd. (a).)  Subdivisions (a)(1) and (a)(2) generally concern racial, ethnic, and national origin bias exhibited by actors involved in the defendant's case, while subdivisions (a)(3) and (a)(4) generally concern broader racial, ethnic, and national origin disparities in the defendant's prosecution and sentencing.  As discussed below, only subdivisions (a)(1) and (a)(2) are at issue here.

If the defendant proves a violation by a preponderance of the evidence, the court "shall impose," from a list enumerated in section 745, subdivision (e), "a remedy specific to the violation found."  (§ 745, subd. (e).)  However, in cases in which judgment was entered before the RJA's initial effective date of January 1, 2021, and the petition is based on a violation of section 745, subdivision (a)(1) or (a)(2), the petitioner is not entitled to relief if "the state proves beyond a reasonable doubt that the violation did not contribute to the judgment."  (§ 745, subd. (k).)

A defendant may seek relief under the RJA by filing "a motion pursuant to [section 745], or a petition for writ of habeas corpus or a motion under Section 1473.7, in a court of competent jurisdiction, alleging a violation of subdivision (a)."  (§ 745, subd. (b).)  The RJA amended section 1473 by adding subdivision (e), which "allows a petition for writ of habeas corpus 'after judgment has been entered based on evidence that a criminal conviction or sentence was sought, obtained, or imposed in violation of subdivision (a) of Section 745.'" (*Wilson*, *supra*, 16 Cal.5th at p.

945, quoting § 1473, subd. (e).) Where, as here, a defendant seeks relief pursuant to a petition for habeas corpus, the trial court must review the petition and "determine if the petitioner has made a prima facie showing of entitlement to relief." (§ 1473, subd. (e).) The RJA defines a "prima facie showing" as the production of "facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred." (§ 745, subd. (h)(2).) "A 'substantial likelihood' requires more than a mere possibility, but less than a standard of more likely than not." (*Ibid.*)

If the defendant makes the requisite showing, "the court shall issue an order to show cause why relief shall not be granted and hold an evidentiary hearing, unless the state declines to show cause." (§ 1473, subd. (e).) After the hearing, "If the court determines that the petitioner has not established a prima facie showing of entitlement to relief, the court shall state the factual and legal basis for its conclusion on the record or issue a written order detailing the factual and legal basis for its conclusion." (*Ibid.*)

## II.    Appointment of Counsel

Section 1473, subdivision (e) provides for the appointment of counsel "if the petitioner cannot afford counsel and either the petition alleges facts that would establish a violation of subdivision (a) of Section 745 or the State Public Defender requests counsel be appointed." (§ 1473, subd. (e).; see also Cal. Rules of Court, rule 4.551(d)(2).) There is no dispute that Taylor is indigent, and the State Public Defender has not requested the appointment of counsel in this case. The critical question thus is whether Taylor has alleged facts that would establish a violation of section 745, subdivision (a). This inquiry is limited "to an

14

assessment of the facial sufficiency of the factual allegations *in the petition*, and to consideration of whether they adequately allege a *violation* of the RJA." (*McIntosh*, *supra*, 110 Cal.App.5th at p. 44, original italics; see also Cal. Rules of Court, rule 4.551(c)(2).)

As relevant here, section 745, subdivision (a)(1) provides that the RJA is violated if "The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." (§ 745, subd. (a)(1).) Section 745, subdivision (a)(2) similarly provides that the RJA is violated if, "During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful."[8] (§ 745, subd. (a)(2).) Subdivision (a)(2) is the only provision that addresses "racially discriminatory language," which the RJA defines as "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially coded language, language that compares the defendant to an animal, or language that references

---

[8] By its terms, section 745, subdivision (a)(2) "does not apply if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the subject." These exceptions are not relevant in the context of this case.

the defendant's physical appearance, culture, ethnicity, or national origin."  (§ 745, subd. (h)(4).)

In his petition, Taylor alleges that the trial court, prosecutor, a law enforcement officer, and the jury exhibited impermissible bias "at trial."  He also refers to "racially discriminatory language," and alleges bias based on factors mentioned exclusively in the RJA's definition of that term, namely "culture" and "physical appearance."  These allegations most directly implicate section 745, subdivision (a)(2). However, Taylor's petition also refers to section 745, subdivision (a) and the RJA generally, and there is considerable overlap between section 745, subdivisions (a)(1) and (a)(2).  Moreover, the general rule is that a habeas petitioner "need not 'develop' the legal theory on which the claim is based, but must fully and fairly state the facts which underlie the claim for relief" (*In re Clark* (1993) 5 Cal.4th 750, 779), and "imposing a 'heavy burden'" at this stage of an RJA case "would be contrary to the Act's structure and purpose." (*Finley, supra*, 95 Cal.App.5th at p. 22.)  We accordingly consider whether Taylor has alleged facts sufficient to establish a violation of either subdivision.  We do not consider section 745, subdivisions (a)(3) or (a)(4), because Taylor's allegations in no way concern statistical disparities in prosecution or sentencing.

Subdivisions (a)(1) and (a)(2), and the RJA generally, prohibit bias based on "the defendant's race, ethnicity, or national origin."  Although Taylor mentions his race at various points, his factual allegations of bias are predicated upon his Islamic religious identity and various actors' purported associations of that identity with the September 11, 2001 attacks and terrorism generally.  Religious discrimination is offensive

16

and must not be endorsed or tolerated, but it is outside the scope of the RJA.

Taylor alleges that the jurors "perceived" him "as a racist 'black muslim,'" and the trial court failed to mitigate this bias and exhibited bias of its own by declining to conduct more extensive voir dire and denying his motion for mistrial. Taylor acknowledges in his briefing that this alleged bias was primarily "anti-Muslim" in nature. Indeed, he requests judicial notice of various news and academic articles purportedly demonstrating "Americans' virulent and widespread anti-Muslim bias after 9/11," "retaliation against Muslims after 9/11," "other judges' diligence in uncovering anti-Muslim bias in the days after 9/11," and "many Americans perceived Muslims as anti-American."[9] However, he argues that courts and scholars "recognize that discrimination against Muslims can be racial, ethnic, or national origin discrimination" and asserts that his "intersectional or overlapping identity as a Black Muslim is inextricable with race and religion, one that evoked a deep animus among many Americans after 9/11."

---

[9] We deny this request, as "[t]he truth of the content of the articles is not a proper matter for judicial notice." (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1141, fn. 6; see also *Glassman v. Safeco Ins. Co. of America* (2023) 90 Cal.App.5th 1281, 1307 ["Further, even if a reviewing court takes judicial notice of documents, it is not for the truth of matters asserted therein"]; Evid. Code, § 452 [listing matters which may be judicially noticed].)

Even if we accept that "discrimination against Muslims can be racial, ethnic, or national origin discrimination,"[10] Taylor's factual allegations do not draw any connection between Taylor's race, national origin, or ethnicity and the alleged anti-Muslim bias he suffered.  Taylor alleges he was "not allowed to voir dire the jury to ascertain the jurors bias about the attacks," but expresses his concern "in light of what petitioner said to the jurors on September 7th, 2001, that is, in terms of an impending attack to be committed 'by so-called muslims,'" not his race, national origin, or ethnicity.  Moreover, the allegations and record demonstrate that both Taylor and the court asked the jurors if they harbored terrorism-related bias, and they affirmatively "told [Taylor] no" and "answered in the negative" when asked by the court. Taylor speculates that if he had "been a White Muslim in typical American dress, the potential for bias would have been miniscule," but this speculation is unsupported by factual allegations or the record.  (Cf. *Finley*, *supra*, 95 Cal.App.5th at p. 23 [court need not accept allegations that are "conclusory" or "demonstrably contradicted by the court's own records"].)

Taylor's allegations concerning the prosecutor and law enforcement officer equally lack a connection to the categories protected under the RJA.  He alleges that the prosecutor exhibited bias by referring to a terrorist attack during scheduling

---

[10]    We note that the federal case law Taylor cites in support of this proposition addresses "anti-Semitic harassment and discrimination" (*T.E. v. Pine Bush Central School District* (S.D.N.Y. 2014) 58 F.Supp.3d 332, 354-355) and "bias against Muslims, Arabs, and Islamic Fundamentalism" (*U.S. v. Salameh* (2d. Cir. 1998) 152 F.3d 88, 120).

18

and "turned her body to look at petitioner directly when she made that coded prejudicial statement." Similarly, he alleges that detective Purdy "suggested petitioner was an international Islamic terrorist that should be investigated for treason" when Purdy testified that murder and "maybe terrorism" were the "utmost investigation as far as crimes."

As Taylor's own gratuitous references to a "Black Timothy McVeigh" illustrate, however, acts of terrorism are not stereotypically associated with perpetrators of any particular race. Moreover, none of the terrorists to whom Taylor refers in his petition—McVeigh, Atta, and Bin Laden—was Black. Taylor does not allege these men or other terrorists shared a common ethnicity or national origin. Taylor speculates in the traverse that "Purdy likely would not have pivoted to terrorism had his questioner been a white non-Muslim defendant," but this speculation is not supported by any factual allegations. Similarly speculative is Taylor's assertion that the prosecutor's alleged turn toward him during a discussion of witness scheduling "transformed a purportedly neutral observation into an accusatory gesture." This assertion further ignores both the patent relevance of the statement to the discussion at hand and Taylor's status as the prosecutor's opposing counsel, whom she would naturally be expected to address. It also ignores Taylor's repeated sua sponte references to terrorism and his claimed links to the perpetrators of the September 11 attacks, which generally undermine his position that other actors in the trial were impermissibly associating him with those same topics. (Cf. *People v. Singh* (2024) 103 Cal.App.5th 76, 117 [finding "multiple tactical reasons why defense counsel may not have objected" to use of term "honor kill" as violative of the RJA, including the

19

defendant's own remarks to an officer about the shooting "in the context of his culture"].)

Taylor's final allegation of bias concerns the juror's comment that Taylor "had not much respect for the whole American way of life," which he contends was "racially discriminatory language and bias under the RJA." This post-trial comment is plainly outside the scope of section 745, subdivision (a)(2), which expressly only applies to the use of racially discriminatory language or other exhibitions of bias or animus toward the defendant "[d]uring the defendant's trial, in court and during the proceedings." We are also not persuaded it falls within the ambit of section 745, subdivision (a)(1), which does not concern "racially discriminatory language." Even if the remark in isolation could be interpreted as an expression of bias toward Taylor's perceived ethnicity or national origin,[11] the statement was not made in a vacuum. The remainder of the juror's statement specifically referred to Taylor's "demeanor, his behavior, and his lack of respect for everybody." These are not immutable characteristics protected by the RJA but rather actions entirely within Taylor's control that properly may serve as a basis for an unfavorable impression.

For all the foregoing reasons, Taylor's petition does not adequately allege a violation of the RJA. He accordingly has not demonstrated that counsel should be appointed.

III. **Production of Discovery**

The RJA authorizes a defendant to "file a motion requesting disclosure to the defense of all evidence relevant to a potential violation of subdivision (a) in the possession or control

---

[11]    Taylor expressly alleges he was born in California.

20

of the state." (§ 745, subd. (d).)  The motion must "describe the type of records or information the defendant seeks." (§ 745, subd. (d).)  The court "shall order the records to be released," if statutory privilege and constitutional privacy rights permit, "upon a showing of good cause." ( § 745, subd. (d).)

Although Taylor did not file a separate motion for discovery, his petition "hereby motions the Court to issue an order for a copy of the voir dire Reporter's Transcript dated 9/07/2001."  For purposes of the instant order to show cause, we treat this request as a motion for discovery under the RJA.

"[T]he good cause requirement for discovery under the [RJA], like the showing required for the disclosure of law enforcement records under *Pitchess* [*v. Superior Court* (1974) 11 Cal.3d 531], requires a defendant 'only to advance a plausible factual foundation, based on specific facts, that a violation of the [RJA] "could or might have occurred" in his [or her] case.'" (*People v. Garcia* (2022) 85 Cal.Appp.5th 290, 296-297, quoting *Young v. Superior Court of Solano County* (2022) 79 Cal.App.5th 138, 159 (*Young*).)  The "threshold showing for good cause must be commensurately broad and flexible," and indeed has been characterized as "minimal." (*Young*, *supra*, 79 Cal.App.5th at pp. 159-160.)

A "minimal" threshold requirement does not mean a petitioner is automatically entitled to requested discovery.  As discussed above, Taylor's petition does not adequately allege that a violation of the RJA "could or might have occurred." Furthermore, it contains no allegations regarding the basis of the request for this particular reporter's transcript or its connection to a plausible RJA claim.  Taylor alleges that he was dressed in Islamic clothing and asked a juror "how it will feel 'to see in the

21

news and media' during petitioner's trial a 'terrorist attack' committed by fake 'so-called Muslims.'" But he makes no allegations about the prospective juror's response, any follow-up questions or colloquy, whether that person was seated on the jury, or what other racial, ethnic, or national origin bias or animus the requested records could or might show. There is thus no "factual foundation, based on specific facts," supporting Taylor's discovery request.

In his traverse, Taylor argues that he "provided strong circumstantial evidence that the judge was biased against him," and therefore "should be permitted to do discovery into a number of issues with the guidance of appointed counsel in the trial court, such as how this judge and other judges in LA County handled trials for both Muslim and non-Muslim defendants after 9/11" and "any other allegations of bias against the judge, prosecutor, and detective." These expansive requests cannot be reconciled with the specific request made in Taylor's petition, nor are they supported by its allegations. Additionally, they underscore the religious-based nature of his contentions.

Taylor has not established good cause for discovery. The request accordingly is denied.

## DISPOSITION

Taylor "has not satisfied the requirements for the appointment of counsel pursuant to Penal Code section 1473, subdivision (e) and for the production of discovery pursuant to Penal Code section 745, subdivision (d)."  The order to show cause is discharged and the petition is denied.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

ZUKIN, ACTING P. J.

DAUM, J.*

---

*       Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.